UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

NATHANIEL B. WASHINGTON,

              Petitioner,

    -vs-

H.D. GRAHAM, SUPERINTENDENT
AUBURN CORRECTIONAL FACILITY

              Respondent.

_____

**DECISION AND ORDER**
**No. 10-CV-0449T**

## I.   Introduction

*Pro se* Petitioner Nathaniel B. Washington ("Petitioner") has filed a timely petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging the constitutionality of his custody pursuant to a judgment entered August 25, 2003, in New York State, Supreme Court, Erie County (Hon. Russell P. Buscaglia), convicting him, after a jury trial, of Murder in the Second Degree (N.Y. Penal Law ("Penal Law") § 125.25 [1]) and Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03 [2]).   Petitioner was sentenced to concurrent terms of imprisonment of twenty-five years to life on the murder conviction and fifteen years on the weapons conviction, followed by a five-year period of post-release supervision.

For the reasons stated below, habeas relief is denied and the petition is dismissed.

## II.  Factual Background and Procedural History

Under Indictment No. 02-0315-001, Petitioner was charged with Murder in the Second Degree (Penal Law § 125.25 [1]) and Criminal Possession of a Weapon in the Second Degree (Penal Law § 265.03 [2]).  The charges arose from an incident that occurred on August 16, 2001 in Buffalo, New York, in which Petitioner shot and killed Gregory Williams ("Williams" or "the victim").  See Ind. No. 02-0315-001 dated 03/14/02 at Resp't Ex. A.

On the date of the incident, Ramona Wallace ("Wallace"), a former drug addict and police informant, was outside her home at 182 Wakefield  talking to a friend.  Trial Trans. [T.T.] 111-116, 121.  Wallace had lived at her home for two years and was familiar with the street and neighborhood.  T.T. 114.  Wallace knew Gregory Williams ("Williams"), who lived at 57 Wakefield.  As Wallace talked to her friend, a "rust colored Lumina" pulled up to the curb in front of Williams' house, which was on the same side of the street on which she was standing.  T.T. 117, 121, 125.  Wallace saw Petitioner, whom she had known for several years, get of the passenger side of the car with a black handgun.  T.T. 122.

Wallace then heard shots, saw Petitioner firing at Williams, and heard Williams holler to a man who was with him to get a gun, but the man ran away.  T.T. 126.  Wallace turned and walked toward her home after the first shot, and heard several more shots as she walked away.  T.T. 127.  The Lumina drove past her, but she did not see what direction it went, and she did not call the police when

she got home.  T.T. 127-128.  Six days after the incident, Wallace called Detective Reggie Minor of the Buffalo Police Department ("BPD") Homicide Squad and told him what she had seen.  T.T. 128. At trial, on cross-examination, Wallace testified that she had initially lied to Detective Minor and told him that she was ten houses away when she saw the shooting, when, in fact, she was only two houses away.  T.T. 185-187.  Wallace explained that she had lied because she was scared, because she had not called the police after the shooting, and "because [Petitioner] is a dangerous individual."  T.T. 187-188, 204.

In a statement that was read to the jury at trial,[1] John Mullen ("Mullen"), a witness for the prosecution, indicated that some time before 3:00 p.m. on August 16, 2001, he was with his cousin at the corner of Victoria and Fillmore Streets when Petitioner drove by in a brown Chevy Lumina and blew his horn.  A few minutes later, the car drove by again, tires screeching, and this time Petitioner was in the passenger seat.  Later that day, Mullen went to visit friends in a home on Vermont Street and saw

---

[1]

This statement forms the basis of one of Petitioner's habeas claims.  Prior to trial, a Sirois hearing was conducted.  A Sirois hearing is a type of evidentiary hearing held during New York state criminal proceedings to determine whether the accused procured a witness's unavailability -- either literal unavailability or refusal to testify -- through misconduct.  A finding of such misconduct precludes the accused from objecting, on hearsay or Confrontation Clause grounds, to the admission of the witness's out-of-court statements.  See People v. Geraci, 85 N.Y.2d 359 (1995); Matter of Holtzman v. Hellenbrand, 92 A.D.2d 405 (2d Dep't 1983).  At the close of the hearing, the trial court ruled that Mullen had been intimidated by Petitioner or others acting on his behalf. The trial court, therefore, permitted, over defense objection, the reading of Mullen's October 20, 2001 statement to police to the jury at trial, as redacted.

the brown Lumina in the driveway.  Petitioner was inside the home along with several other men.  They were all playing cards. Petitioner offered all of the men the Lumina, telling them it had a full tank of gas and that he would pay to have it washed and detailed.  Petitioner indicated that whoever took the car was free to "tear it up" because he did not care what happened to it.  In his statement to police, Mullen indicated that he had already heard about the shooting on Wakefield Street and believed that "the car was hot."  Mullen recalled that, while he was at the home on Victoria Street, Petitioner removed a chrome gun from his belt, which he unloaded after one of the men started to play with it. When Petitioner began winning the card game, the men in the room chanted, "break the chair, break the chair."  Mullen asked Petitioner what this statement meant.  Petitioner told the men that he "caught the boys sleeping," got out of his car, walked up on the porch, put the gun to the victim's chest and fired, breaking the back of the chair.  When the victim fell, Petitioner had grabbed him and shot him again, while the victim begged him not to shoot anymore and offered to repay money.  In his statement, Mullen indicated that when Petitioner said, "I shot the Nigga," he knew he was referring to Williams.  See T.T. 368-371.

A jury trial was conducted, at the close of which Petitioner was found guilty as charged.  T.T. 441-442.  He was subsequently sentenced to concurrent terms of imprisonment of twenty-five years to life on the murder conviction and fifteen years on the weapons

conviction, followed by a five-year period of post-release supervision. See Certificate of Conviction-Imprisonment at Resp't Ex. A.

The Appellate Division, Fourth Department unanimously affirmed the judgement of conviction, and leave to appeal was denied. People v. Washington, 34 A.D.3d 1193 (4th Dep't 2006); lv. denied, 8 N.Y.3d 928 (2008).

On or about April 8, 2003, Petitioner filed a motion for vacatur, pursuant to N.Y. Crim. Proc. Law ("CPL") § 440.10, in the Appellate Division, Fourth, Department, which was denied. Leave to appeal was denied. See Resp't Ex. D.

This habeas corpus petition followed, wherein Petitioner seeks relief on the following grounds: (1) his right to confrontation was violated by the trial court's Sirois ruling; (2) ineffective assistance of trial counsel; (3) a Brady violation; (4) deprivation of right to present a defense; and (5) a Batson violation. See Pet. ¶ 12, Grounds One-Six (Dkt. No. 1); Traverse [Tv.] (Dkt. No. 9).

## III. General Principles Applicable to Habeas Review

### A.    The AEDPA Standard of Review

Under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a federal court may grant habeas relief to a state prisoner only if a claim that was "adjudicated on the merits" in state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established

Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or if it "was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." § 2254(d)(2). A state court decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413 (2000). The phrase, "clearly established Federal law, as determined by the Supreme Court of the United States," limits the law governing a habeas petitioner's claims to the holdings (not *dicta*) of the Supreme Court existing at the time of the relevant state-court decision. Williams, 529 U.S. at 412; accord Sevencan v. Herbert, 342 F.3d 69, 73-74 (2d Cir. 2002), cert. denied, 540 U.S. 1197 (2004).

A state court decision is based on an "unreasonable application" of Supreme Court precedent if it correctly identified the governing legal rule, but applied it in an unreasonable manner to the facts of a particular case. Williams, 529 U.S. at 413; see also id. at 408-10. "[A] federal habeas court is not empowered to grant the writ just because, in its independent judgment, it would have decided the federal law question differently." Aparicio v. Artuz, 269 F.3d 78, 94 (2d Cir. 2001). Rather, "[t]he state court's application must reflect some additional increment of

-6-

incorrectness such that it may be said to be unreasonable." Id. This increment "need not be great; otherwise, habeas relief would be limited to state court decisions so far off the mark as to suggest judicial incompetence." Francis S. v. Stone, 221 F.3d 100, 111 (2d Cir. 2000) (internal quotation marks omitted).

Under AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct.   The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Parsad v. Greiner, 337 F.3d 175, 181 (2d Cir. 2003) ("The presumption of correctness is particularly important when reviewing the trial court's assessment of witness credibility."), cert. denied sub nom. Parsad v. Fischer, 540 U.S. 1091 (2003).   A state court's findings "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).

**B.    Exhaustion Requirement**

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to a judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . ." 28 U.S.C. § 2254(b)(1)(A); see, e.g., O'Sullivan v. Boerckel, 526 U.S. 838, 843-44 (1999); accord, e.g., Bossett v. Walker, 41 F.3d 825, 828 (2d Cir.1994), cert. denied, 514 U.S. 1054 (1995).   "The exhaustion

requirement is not satisfied unless the federal claim has been 'fairly presented' to the state courts." <u>Daye v. Attorney General</u>, 696 F.2d 186, 191 (2d Cir. 1982) (*en banc*), <u>cert. denied</u>, 464 U.S. 1048 (1984).

### C.    The Adequate and Independent State Ground Doctrine

A procedural default generally bars a federal court from reviewing the merits of a habeas claim. <u>Wainwright v. Sykes</u>, 433 U.S. 72 (1977). Federal habeas review is prohibited if a state court rests its judgment on a state law ground that is "independent of the federal question and adequate to support the judgment." <u>Cotto v. Herbert</u>, 331 F.3d 217, 238 (2d Cir. 2003) (quoting <u>Coleman v. Thompson</u>, 501 U.S. 722, 729 (1991)); <u>accord</u> <u>Jones v. Stinson</u>, 229 F.3d 112, 117 (2d Cir. 2000). A state procedural bar qualifies as an "independent and adequate" state law ground where "'the last state court rendering a judgment in the case clearly and expressly states that its judgment rests on a state procedural bar.'" <u>Levine v. Comm'r of Corr. Servs.</u>, 44 F.3d 121, 126 (2d Cir. 1995) (quoting <u>Harris v. Reed</u>, 489 U.S. 255, 262 (1989)). A state procedural rule will be adequate to preclude habeas review if it is "firmly established and regularly followed," unless the state rule is "exorbitant." <u>Lee v. Kemna</u>, 534 U.S. 362, 376 (2002) (quoting <u>James v. Kentucky</u>, 466 U.S. 341, 348 (1984)).

A federal court may review a claim, notwithstanding the petitioner's default, if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of

federal law." <u>Coleman</u>, 501 U.S. at 750;  <u>see</u> <u>also</u> <u>Levine</u>, 44 F.3d at 126; <u>Grey v. Hoke</u>, 933 F.2d 117, 121 (2d Cir. 1991). A petitioner may establish cause by pointing to "some objective factor external to the defense [that] impeded counsel's efforts to comply with the State's procedural rule." <u>Murray v. Carrier</u>, 477 U.S. 478, 488 (1986); <u>accord</u> <u>Coleman</u>, 501 U.S. at 753. A petitioner suffers actual prejudice if the outcome of the case would likely have been different had the alleged constitutional violation not occurred. <u>See</u> <u>Reed v. Ross</u>, 468 U.S. 1, 12 (1984). Alternatively, even if the petitioner is unable to show cause and prejudice, the court may consider the claim if he can demonstrate that failure to do so will result in a "fundamental miscarriage of justice." <u>Coleman</u>, 501 U.S. at 750.

**IV.  Petitioner's Claims**

**1.   Confrontation Violation**

In grounds one and four of the petition, Petitioner argues, as he did on direct appeal, that the People's introduction at trial of the sworn statement of Mullen violated his right to confrontation. <u>See</u> Pet. ¶12, Grounds One, Four. The Appellate Division, Fourth Department rejected this claim on the merits. <u>See</u> <u>Washington</u>, 34 A.D.3d at 1193-94.[2] As discussed below, this claim is meritless.

---

[2]

The Appellate Division, Fourth Department ruled as follows: "Supreme Court properly admitted into evidence the sworn statement of a witness who refused to testify at trial.  The People established by clear and convincing evidence at the <u>Sirois</u> hearing that misconduct by defendant or others acting at his behest caused that witness to be unavailable to testify at defendant's trial." <u>Washington</u>, 34 A.D.3d at 1193-94 (internal citations and quotations omitted)

The Confrontation Clause of the Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right. . . to be confronted with the witnesses against him." U.S. Const. amend. VI. A defendant's confrontation right is a "fundamental right essential to a fair trial in a criminal prosecution" and secures for a defendant the opportunity of cross-examination. United States v. Dhinsa, 243 F.3d 635, 651 (2d Cir. 2001) (citing Pointer v. Texas, 380 U.S. 400, 404 (1965)). The Confrontation Clause is generally violated, therefore, when "hearsay evidence [is] admitted as substantive evidence against the defendant with no opportunity to cross-examine the hearsay declarant at trial, or when an out-of-court statement of an unavailable witness does not bear adequate indications of trustworthiness." Latorres v. Walker, 216 F. Supp. 2d 157, 165 (S.D.N.Y. 2000) (citing Kentucky v. Stincer, 482 U.S. 730, 737 (1987)).

Despite its constitutional significance, the right of confrontation is not absolute. Indeed, the Supreme Court has held that a defendant's intentional misconduct may, under limited circumstances, result in a waiver of his rights under the Confrontation Clause. Illinois v. Allen, 397 U.S. 337, 343 (1970). Under such circumstances, a witness's out-of-court statements may be admitted at trial in lieu of his or her live testimony without violating a defendant's right of confrontation. Brookhart v. Janis, 384 U.S. 1, 4, (1966)). The waiver by misconduct rule prevents a defendant from asserting his confrontation rights to

reap the benefits of his own misconduct by precluding former testimony from being admitted against him. United States v. Mastrangelo, 693 F.2d 269, 272-73 (2d Cir. 1982).

Although it is clear that a defendant may waive his right to confront witnesses, the Supreme Court has yet to establish the boundaries of the waiver rule. Consequently, there is dispute among the circuits as to what test should be used to determine whether a defendant has waived his rights. Cotto v. Herbert, 331 F.3d 217, 231, 234 (2d Cir. 2003) (citing Fed. R. Evid. 804(b) (6) advisory committee's note to 1997 Amend.). The Second Circuit applies the "waiver by misconduct" rule in cases where a defendant has wrongfully procured a witness's silence by chicanery, threats, or actual violence or murder. Mastrangelo, 693 F.2d at 272-73.

Under New York's waiver-by-misconduct rule, the prosecution may "allege specific facts which demonstrate a distinct possibility . . . that the criminal defendant's misconduct has induced a witness' unlawful refusal to testify." Holtzman, 92 A.D.2d at 415 (quotation omitted). If the trial court finds that the prosecution has presented clear and convincing evidence that the defendant's misconduct caused the witness's refusal to testify, the defendant will be found to have "waived" his confrontation rights, and the witness's prior testimony may be admitted. Id.; see also Geraci, 85 N.Y.2d at 366 ("out-of-court statements, including Grand Jury testimony, may be admitted as direct evidence where the witness is unavailable to testify at trial and the proof establishes that the

witness' unavailability was procured by misconduct on the part of the defendant."). However, the Second Circuit has held that, in federal cases, the prosecution need only prove by a preponderance of the evidence that the defendant was responsible for a witness' unavailability. Mastrangelo, 693 F.2d at 274. Therefore, a court's "finding of admissibility [after a Sirois hearing applying New York's higher standard], . . . if correct, would also satisfy the constitutional standard." La Torres v. Walker, 216 F. Supp. 2d 157, 166 (S.D.N.Y. 2000).

The right of confrontation may only be waived by a defendant's intentional misconduct, given the essentiality of cross-examination to a defendant's fair trial. Circumstantial evidence, however, "including a defendant's motive and opportunity to prevent a witness from testifying, may suffice to meet the [clear and convincing] standard, so long as the inference of a defendant's involvement in procuring a witness's unavailability is clear." Id. at *11 (citing Geraci, 85 N.Y.2d at 368). See also Geraci v. Senkowski, 23 F. Supp. 2d 246, 258 (E.D.N.Y. 1998) (judges may "use their common sense in drawing inferences" to make their determination at Sirois hearing).

A trial court's finding that a witness' refusal to testify is based upon threats of harm caused by the defendant is a factual determination entitled to a presumption of correctness under 28 U.S.C. § 2254(e)(1). Thus, it may be overturned on habeas review only if: (1) a petitioner presents clear and convincing evidence

that the court erred in its determination; or (2) it was based on an unreasonable application of the facts.  See 28 U.S.C. § 2254(e) (1);  28 U.S.C. § 2254(d)(2);  see also Cotto 331 F.3d at 233 (given the narrow scope of review under 2254(e)(1), habeas court cannot reverse state trial court's finding that petitioner caused the intimidation of the unavailable witness as an unreasonable determination of facts under 2254(d)(2)).  Deference to a trial court's factual determination is particularly important when considering witness credibility.  See Latorres, 216 F. Supp. 2d at 167 ("AEDPA gives federal habeas courts no license to redetermine credibility of witnesses whose demeanor has been observed by the state trial court, but not by them.").

This Court concludes that Petitioner waived his right of confrontation with respect to Mullen's statement through threats, which directly caused Mullen to refuse to testify.  Petitioner's claim is therefore rejected.

The trial court's decision that Petitioner (or those acting on his behalf) procured Mullen's unavailability was not an unreasonable application of federal law or an unreasonable determination of the facts in light of the evidence presented. Rather, its determination was reasonable and based on a thorough and extensive set of factual findings, as set forth below:

> At the Sirois hearing, Mr. John Mullen,
> Mr. Frank LoTempio, Jr., Mr. Joseph Higgins,
> Ms. Addie Mae Mullen, Ms. Cheryl Martinez, and
> Mr. Harrison Mullen testified.  I find that
> the credible testimony at the hearing revealed
> that one Robert Rembert, who was a cousin or

-13-

friend of the defendant, had contacted
Mr. Mullen on January 5, 2003, at
approximately 8:30 p.m. outside Mr. Mullen's
home. Mr. Mullen's cousin, Torrey Overstreet,
told Mr. Mullen to go talk to Mr. Rembert, and
in Mr. Rembert's car Mr. Rembert made certain
statements to Mr. Mullen to the effect that he
knew where Mr. Mullen lived at all times and
that he should not testify and that his life
would be short. Mr. Rembert also offered to
give Mr. Mullen money if he would leave and
move out of town, and Mr. Rembert also told
Mr. Mullen that he wasn't the only one –
meaning Mr. Rembert wasn't the only one. I
also find that on December 25th, Christmas Day,
of 2002, Mr. Mullen was at his grandmother's
house and at that time he received a telephone
call from the defendant, and at the time he
received the telephone call he was told that
he should not come to court and should not
testify and should plead the Fifth Amendment.
Mr. Overstreet also told Mr. Mullen on January
5th that he should not come to court of his
life would be shortened. Approximately two
months before these incidents Mr. Mullen's
house or home on Grand Island was damaged.
People came to his home and threatened him and
hold him he should not testify. Also after
the statements made to Mr. Mullen by
Mr. Overstreet he filed charges against
Mr. Overstreet regarding those statements – in
addition to the initial statements made by
Mr. Rembert there was also a reference to a
recent murder on another street in the City of
Buffalo, and Mr. Mullen took that to mean he
would be murdered if he testified. The
credibility testimony at the hearing also
revealed several other instances where – or
extensive testimony, I should say, relative to
the credibility of Mr. Mullen. That testimony
came from Mr. LoTempio, who was an attorney
for an acquaintance of Mr. Mullen by the name
of Thomas Swan. Now, there was also testimony
from Mr. Higgins, who worked for the Erie
County Sheriff's Department at the Holding
Center, who indicated that on December 25th,
2002, there were five phones available to the
defendant who was at the Holding Center on
that date in a certain area of the Holding
Center referred to as Fox Trot South, and that

-14-

no telephone calls were placed to the telephone number of the defendant's grandmother . . . on that date. Mr. Higgins also testified about the ability of prisoners to make three-way telephone calls, and that notwithstanding the fact that they are not permitted, it is routinely disregarded, an on that particular day, December 25th, 2002, there were 308 attempts at making three-way telephone calls, of which 229 were terminated, which meant 79 went through . . . and that it is easy to beat the machine, and when a three-way telephone call is made the ultimate designation of the call is not able to be ascertained. The testimony of Addie Mae Mullen, Cheryl Martinez, and Harrison Mullen was to the effect that Mr. Mullen . . . was not as his grandmother's home . . . on December 25th, 2002.

T.T. 418-423. Based on the facts established at the hearing, the trial court determined that the People had established by clear and convincing evidence that Petitioner's misconduct rendered Mullen unavailable to testify during the trial. The trial court therefore granted the People's request to introduce Mullen's sworn statement at trial. T.T. 423-424.

The record before this Court supports the trial court's factual findings. The trial court's determination that the prosecution proved by clear and convincing evidence that petitioner's intentional misconduct procured Mullen's unavailability was therefore not unreasonable in light of the evidence presented.

Petitioner has failed to provide any evidence that the trial court erred in admitting Mullen's statement at trial. He has also failed to demonstrate that the court's determination of Mullen's

unavailability involved an unreasonable application of federal law or the facts of his case. Accordingly, Petitioner's claim is dismissed in its entirety.

## 2. Ineffective Assistance of Trial Counsel

Petitioner argues, as he did in his motion for vacatur, that he received ineffective assistance of trial counsel based upon: (1) trial counsel's failure to call two witnesses (Robert Rembert ("Rembert") and Torrey Overstreet ("Overstreet")) to testify at the Sirois hearing; and (2) trial counsel's failure to call two witnesses (Raymond Cook ("Cook") and Jamori Williams ("J. Williams")) to testify at the trial. See Pet. ¶ 12, Ground Two. The Appellate Division, Fourth Department rejected the former portion of this claim on the merits, and the latter portion of this claim on a state procedural ground, pursuant to CPL § 440.10(2)(c). See Resp't Ex. D. Thus, as discussed below, Petitioner's ineffective assistance of trial counsel claim is partially meritless and partially procedurally defaulted from habeas review.

### (A) Failure to Call Witnesses at Sirois Hearing (Rembert and Overstreet)

Petitioner argues that he received ineffective assistance of trial counsel based upon trial counsel's failure to call witnesses Rembert and Overstreet to testify at the Sirois hearing. See Pet. ¶ 12, Ground Two. This claim is meritless.

To establish that he was deprived of his Sixth Amendment right to the effective assistance of trial counsel, a petitioner must

show that (1) his attorney's performance was deficient, and that (2) this deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984). Deficiency is measured by an objective standard of reasonableness, and prejudice is demonstrated by a showing of a "reasonable probability" that, but for counsel's unprofessional errors, the result of the trial would have been different. Id. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding." Id. To succeed, a petitioner challenging counsel's representation must overcome a "strong presumption that [his attorney's] conduct falls within the wide range of reasonable professional assistance." Id. at 689. A reviewing court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Id.

Here, the Court cannot find that, given the particular facts and circumstances of the case, counsel's decision not to call Rembert and Overstreet to testify at the Sirois hearing was unreasonable. The record reflects that Mullen testified at the Sirois hearing that Petitioner had threatened him during a telephone call received at Addie Mae Mullen's (Petitioner's grandmother) house on Christmas Day 2002. H.M. 8-9. In a logical attempt to refute this testimony, trial counsel called Addie Mae Mullen and two other witnesses to testify that Mullen was not

present at Addie Mae Mullen's house on that date.  As the Appellate Division, Fourth Department noted in rejecting this claim on collateral review, trial counsel could have reasonably concluded that Rembert and Overstreet would not have been credible witnesses or that they would have invoked their Fifth Amendment rights.  See Resp't Ex. D.  Indeed, given the circumstances, it was entirely reasonable for counsel not to call Rembert and Overstreet to testify at the hearing.

Moreover, Petitioner has failed to make a showing of prejudice, and this Court remains unconvinced that even if trial counsel had performed as Petitioner wished him to perform in this particular respect, there is a reasonable probability of a more favorable outcome at Petitioner's trial.  Because Petitioner cannot fulfill both prongs of the Strickland test, this portion of his ineffective assistance of counsel claim fails on the merits.

Accordingly, this Court cannot find that the state court's adjudication of this issue was contrary to or an unreasonable application of settled Supreme Court law.  This portion of Petitioner's ineffective assistance of counsel claim is therefore dismissed as meritless.

### (B)   Failure to Call Witnesses at Trial (Cook and J. Williams)

Petitioner argues that he received ineffective assistance of trial counsel based upon trial counsel's failure to call Cook and J. Williams to testify at trial.  See Pet. ¶ 12, Ground Two.  This

claim, which was rejected on a state procedural rule, pursuant to CPL § 440.10(2)(c), is procedurally defaulted from habeas review.

The record before this Court reveals that, prior to sentencing, Petitioner moved to set aside the verdict, pursuant to CPL § 330.30, on the basis of new evidence consisting of the prospective testimony of Cook and J. Williams, two individuals who were with the victim at the time of the shooting. The trial court granted a hearing on the motion, at which both Cook and J. Williams testified. Ultimately, the trial court denied Petitioner's motion, finding that the evidence was not newly discovered, and that the testimony of Cook and J. Williams lacked credibility. See Resp't Ex. A. Subsequently, Petitioner raised this same issue again in his motion for vacatur. In denying the portion of the motion relevant to said claim, the Appellate Division, Fourth Department relied on CPL § 440.10(2)(c), finding that sufficient facts appeared in the record to have permitted direct appellate review of this issue, and that Petitioner had unjustifiably failed to raise the issue on direct appeal. See Resp't Ex. D. The Second Circuit has recognized CPL § 440.10(2)(c) as an adequate and independent state ground sufficient to preclude federal habeas review of a state-court defendant's claims. See e.g., Sweet v. Bennett, 353 F.3d 135, 139-40 (2d Cir. 2003); Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997); Aparicio, 269 F.3d at 91 (2d Cir. 1991). Thus, the state court's reliance on CPL § 440.10(2)© to deny Petitioner's

claim bars this Court's review of it.  Petitioner does not allege cause and prejudice to overcome the procedural default, and he has not made a colorable showing of actual innocence so as to warrant invocation of the "miscarriage of justice" exception.[3]  See McCleskey v. Zant, 499 U.S. 467, 495 (1991).  Consequently, he cannot overcome the state procedural bar, and this portion of his ineffective assistance of counsel claim is dismissed as procedurally defaulted.

In sum, the Court finds that Petitioner's ineffective assistance of counsel claim, as a whole, provides no basis for habeas relief and is dismissed in its entirety.

## 3.   **Brady** Violation

Petitioner argues, as he did on direct appeal, that his rights under Brady v. Maryland, 373 U.S. 83 (1963), were violated by the prosecution's untimely disclosure of statements, which included descriptions of the shooter, made by J. Williams and Cook to

---

[3]

Liberally construing Petitioner's Traverse, he advances a claim of actual innocence in this proceeding in an attempt to overcome the procedural default. See Tv. 5-15.  However, said claim is not based on "newly discovered evidence," but, instead, the same evidence that was presented to the CPL § 330.30 court and the CPL § 440.10 court.  "To be credible," a claim of actual innocence must be based on new reliable evidence not presented at trial.  Schlup v. Delo, 513 U.S. 298, 324 (1995).  Petitioner has not come forward with new reliable evidence of his actual innocence, and, to this extent, cannot fulfill the fundamental-miscarriage exception.  Additionally, the Court notes that a showing of actual innocence means factual innocence, not legal insufficiency.  See Bousley v. United States, 523 U.S. 614, 623-24 (1998).  The gravamen of Petitioner's "actual innocence" argument is that the unheard testimony of J. Williams and Cook (at trial) would have undermined the People's proof of identification.  Substantively, this is a claim of legally insufficient evidence, not factual innocence, and is therefore insufficient to fulfill the fundamental-miscarriage exception.

police.   See Pet. ¶ 12, Ground Three.   The Appellate Division, Fourth Department rejected this claim on the merits.[4]   See Washington, 34 A.D.3d at 1194.   As discussed below, this claim is meritless.

"Suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to either guilt or punishment irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. Evidence is material when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985).   When a habeas claim is based on belated disclosure of Brady information, rather than non-disclosure of such information, a petitioner is not entitled to reversal, even if the information is deemed material, "unless he can show that the delayed disclosure caused him prejudice." United States v. Diaz, 922 F.2d 998, 1007 (2d Cir.), cert. denied, 500 U.S. 925 (1991). Petitioner cannot meet this standard.

The record reflects that, on May 30, 2002, defense counsel made a specific request for Brady material, in which he sought "any information, documentation reflecting misidentification or non-

---

[4]

The Appellate Division, Fourth Department ruled as follows: "Further, assuming that those descriptions [of the shooter] constituted Brady material, we conclude that defendant had a meaningful opportunity to use that material and was thus not denied a fair trial by the timing of its delivery." Washington, 34 A.D.3d at 1194 (citations omitted).

identification of Mr. Washington as a participant in any of the alleged offenses." <u>See</u> Resp't Ex. A.  On January 6, 2003, prior to jury selection, the prosecutor turned over <u>Rosario</u> material, which included the statements of J. Williams and Cook.  Motion Mins. [M.M.] of 01/06/03 21.  In J. Williams' statement to the police, he indicated that he was present with the victim when the victim was shot.  J. Williams described the shooter as a "young black male in his early 20s, about 150 lbs., tall, medium skin with short nappy hair cut."  When asked if he could identify the shooter, he said "maybe."  <u>See</u> Resp't Ex. A.  Cook also provided police with a statement on August 16, 2001, in which he indicated that he was present with the victim when the victim was shot.  Cook indicated that he had never seen the shooter before and described him as a "dark skinned male, about 6 feet tall, around 35 or 36 years old, about 190 lbs., short hair, like a light moustache or goatee." Cook stated that if he saw the shooter again, he would be able to identify him.  <u>See</u> Resp't App. A.

Even assuming arguendo that the statements constituted <u>Brady</u> material, Petitioner has not and cannot establish prejudice (i.e., that his attorney did not possess the evidence in time for its effective use at trial).  As discussed above, Petitioner made a specific request for the statements, which were delivered prior to the start of trial and with sufficient time for Petitioner to locate Cook and J. Williams.  Although Petitioner was unable to

locate these individuals in time for the trial itself, he did call
them as witnesses during the CPL § 330.30 hearing.  Additionally,
the Court notes that in his opening statement, defense counsel
indicated to the jury that the prosecutor failed to tell them about
J. Williams and Cook, who were with the victim when the victim was
shot.  Defense counsel went on to inform the jury as follows: that
neither J. Williams nor Cook was positive that Petitioner was the
shooter; that Williams had failed to identify Petitioner in a line-
up; and that Cook had identified someone other than Petitioner in
a photo array.  T.T. 53-54.  Thus, Petitioner's counsel made use of
the statements both at trial (albeit to a limited extent) as well
as the CPL § 330.30 hearing, and there is not a reasonable
probability that disclosure of the statements any earlier would
have changed the outcome of the proceeding.  Petitioner's <u>Brady</u>
claim is therefore meritless.

Accordingly, the Court cannot find that the state court's
adjudication of this claim was contrary to or an unreasonable
application of settled Supreme Court law, and the claim is
dismissed.

**4.   Deprivation of Right to Present a Defense**

Petitioner contends, as he did on direct appeal, that the
trial court's preclusion of testimony from Detectives Stambach and
Mordino deprived him of his constitutional right to present a
defense.  <u>See</u> Pet. ¶ 12, Ground Five.  The Appellate Division,

-23-

Fourth Department rejected this claim on the merits.   See Washington, 34 A.D.3d at 1194.   As discussed below, this claim provides no basis for habeas relief.

The record reflects that, during the trial, the court requested an offer of proof from defense counsel as to the proposed testimony of Detectives Stambach and Mordino.   T.T. 241.   Defense counsel indicated that he wanted to call Detective Stambach to elicit from him the description of the shooter given to him by Cook, who witnessed the crime.   T.T. 242.   The trial court denied the request on the ground that such testimony would be hearsay. T.T. 246.   Counsel's argument concerning his request to call Detective Mordino was that he wanted to question him concerning Mullen's credibility and the credibility of the statement he took from him.   T.T. 224-225.   In denying the request, the trial court noted that it would allow Detective Mordino to identify Mullen's statement as having been recorded by him, but would not allow questions concerning credibility issues in light of its Sirois ruling.   T.T. 226.   On the morning of jury selection on January 6, 2003, the prosecutor read into the record a list of the Rosario material it had turned over to defense counsel.   It included the statement made by Cook.   M.M. of 01/06/03 21.   Ten days later, during the trial, defense counsel informed the trial court that he had been unable to locate Cook, who had given a statement (including a description of the shooter), to Detective Stambach, which, he argued, was helpful to Petitioner.   T.T. 243.   Notably,

defense counsel did not request an adjournment to continue his search for Cook at that time.

The right to present a defense is a fundamental right guaranteed by the Sixth and Fourteenth Amendments. See Gilmore v. Taylor, 508 U.S. 333, 343 (1993) (citing Crane v. Kentucky, 476 U.S. 683, 690 (1986)); Chambers v. Mississippi, 410 U.S. 284, 294 (1973) ("The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations."); Wade v. Mantello, 333 F.3d 51, 57 (2d Cir. 2003) ("Supreme Court precedent makes clear that a criminal defendant is entitled by the Constitution to a meaningful opportunity to present a complete defense.").

That right, however, is not without limitations. "The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence." Taylor v. Illinois, 484 U.S. 400, 410 (1988); accord Chambers, 410 U.S. at 302; Holmes v. South Carolina, 547 U.S. 319, 326 (2006) ("[w]ell-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury"); Wade, 333 F.3d at 58 ("The power of courts to exclude evidence through the application of evidentiary rules that serve the interests of fairness and reliability is well-settled."); Washington v. Schriver, 255 F.3d 45, 56 (2d Cir. 2001) (same). "Nevertheless,

state evidentiary rules cannot be inflexibly applied in such a way as to violate fundamental fairness." Washington, 255 F.3d at 56.

In determining whether the exclusion of evidence violated a defendant's right to present a defense, a court must first determine whether the trial court's evidentiary ruling was proper. If it was not, the court must then determine "whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist." Wade, 333 F.3d at 59 (internal quotation marks omitted) (quoting Justice v. Hoke, 90 F.3d 43, 47 (2d Cir. 1996) (quoting United States v. Agurs, 427 U.S. 97 (1976)).

Under New York law, hearsay is defined as "a statement made out of court . . . offered for the truth of the fact asserted in the statement." People v. Goldstein, 6 N.Y.3d 119, 127 (2005) (internal citations omitted).  New York courts have recognized a constitutionally-based exception to the hearsay rule for certain evidence offered by criminal defendants that provides equivalent circumstantial guarantees of trustworthiness. See People v. Robinson, 89 N.Y.2d 648, 654 (1997) (allowing defendant, on constitutional principles of due process, to introduce grand jury testimony of unavailable witness, even though such testimony did not fall within recognized hearsay exception); People v. James, 242 A.D.2d 389, 389 (2d Dep't 1997) (same); People v. Esteves, 152 A.D.2d 406, 413 (2d Dep't 1989) (recognizing that the United States Constitution may require courts to admit exculpatory hearsay statements that do not fall within any recognized hearsay

exception).  <u>See</u> <u>also</u> <u>Morales v. Portuondo</u>, 154 F. Supp. 2d 706, 724-25 (S.D.N.Y. 2001) (comparing New York's constitutional hearsay exception with the federal residual hearsay exception).  In <u>Robinson</u>, the New York Court of Appeals held that a defendant's constitutional right to due process permitted the admission of grand jury testimony at trial where "the declarant has become unavailable to testify at trial" and "the hearsay testimony is material, exculpatory and has sufficient indicia of reliability." <u>See</u> <u>Robinson</u>, 89 N.Y.2d at 654.

Here, the trial court's refusal to allow testimonial evidence from Detective Stambach with respect to Cook's description of the shooter did not improperly thwart his right to present a defense. Cook's description of the shooter, which was provided to the police on August 16, 2001 (shortly after the shooting), was clearly made out of court.  Thus, it was inadmissible hearsay unless it was not offered for the truth of the facts asserted in the statement, or unless it fell within an exception to the hearsay rule.  Petitioner argued (both at trial and on direct appeal) that Detective Stambach's testimony was admissible under the "general reliability exception" recognized in <u>People v. Robinson</u>.  In order to have the hearsay evidence admitted under this exception, he needed to meet the admissibility standards set forth in <u>Robinson</u>.  Petitioner failed to do so, and the hearsay exception was therefore inapplicable to his case.  Therefore, the trial court properly precluded the hearsay testimony of Detective Stambach at trial.

Even assuming arguendo that the exclusion of such evidence was improper under state law, the error did not deprive Petitioner of a fundamentally fair trial. The record reflects that the prosecution built its case primarily on the testimony of Wallace and the sworn statement of Mullen. Wallace, who had known Petitioner for a number of years and witnessed the crime, positively identified Petitioner as the perpetrator of the crime. Mullen, although he did not testify in person, provided a detailed account of the events of August 12, 2001, which included statements made by Petitioner in which he admitted to shooting Williams. To this extent, even if the court had permitted Detective Stambach to introduce Cook's description of the shooter, which, the Court points out, was strikingly different than the description provided by J. Williams, it would have been stacked against the compelling testimony of Wallace and Mullen, which was supported and corroborated by the other evidence presented at trial. When viewing the record as a whole, the introduction of Detective Stambach's testimony would not have created a reasonable doubt in the jury's mind that did not otherwise exist, in light of the overwhelming evidence of Petitioner's guilt.

Similarly, Petitioner's claim that the trial court's preclusion of Detective Mordino's testimony about the circumstances surrounding Mullen's statement deprived him of his right to present a defense is also meritless. Petitioner was properly precluded from exploring credibility issues with respect to Mullen as a result of the trial court's <u>Sirois</u> hearing. As discussed at

section "IV, 1" above, the <u>Sirois</u> court properly determined that Petitioner had forfeited the right to challenge Mullen's credibility when he threatened him, thereby making him unavailable to testify at the trial. As a result of Petitioner's own actions, Mullen's statement to police was read into evidence, and credibility determinations were therefore properly left to the jury.

Accordingly, the Appellate Division's decision affirming the propriety of the trial court's evidentiary rulings with respect to Detectives Stambach and Mordino was not contrary to, or an unreasonable application of settled Supreme Court law. The claim is therefore dismissed in its entirety.

## 5.   **<u>Batson</u> Violation**

Petitioner argues, as he did on direct appeal, that the prosecutor violated the precepts of <u>Batson v Kentucky</u>, 476 U.S. 79 (1986), by exercising a peremptory challenge to prospective juror D.H. based on her race. <u>See</u> Pet. ¶12, Ground Six. The Appellate Division, Fourth Department rejected this claim on the merits, finding that "[t]he court properly rejected defendant's <u>Batson</u> challenge to the prosecutor's use of a peremptory challenge with respect to an African-American prospective juror. The court was in the best position to observe the demeanor of the prospective juror and the prosecutor, and its determination that the prosecutor's explanation was race-neutral and not pretextual is entitled to great deference." <u>See</u> <u>Washington</u>, 34 A.D.3d at 1194 (internal

citations and quotations omitted).  As discussed below, this claim is meritless.

In Batson, the Supreme Court held that the Equal Protection Clause of the Constitution prohibits a prosecutor from excluding prospective jurors "solely on account of their race or on the assumption that black jurors as a group will be unable to impartially consider the State's case against a black defendant." Batson, 476 U.S. at 89.  There are three steps to a Batson inquiry. Initially, the opponent of a peremptory challenge must make out a prima facie case of discrimination.  Purkett v. Elem, 514 U.S. 765, 767 (1995).  The burden of production then shifts to the proponent of the strike to come forward with a race-neutral explanation.  Id. "The second step of this process does not demand an explanation that is persuasive, or even plausible."  Id. at 767-68.  If a race-neutral explanation is provided, the trial court must then decide whether the opponent challenging the strike has proved purposeful discrimination.  Id. at 767.  That determination is a finding of fact entitled to deference by the reviewing court. Hernandez v. New York, 500 U.S. 352, 364-66 (1991); see Purkett, 514 U.S. at 769 ("[I]n habeas proceedings in federal courts, the factual findings of state courts are presumed to be correct, and may be set aside, absent procedural error, only if they are 'not fairly supported by the record.'") (citation omitted);  United States v. Douglas, 525 F.3d 225, 239 (2d Cir. 2008) ("Since a finding as to whether there was intentional discrimination is a finding of fact, and the trial court findings in this context

largely will turn on evaluation of credibility, the trial court's
finding as to whether the prosecutor's reason was race-neutral may
be overturned only if that finding is clearly erroneous.")
(citation omitted); see generally 28 U.S.C. §§ 2254(d)(2), (e)(1).

During jury selection, D.H., an African-American prospective
juror, indicated that her son had been a victim of a crime when he
was 16-years-old.   T.T. 388, 389.   When asked to explain the
particulars of the crime perpetrated against her son, D.H.
explained that her son had been on his way home from the drugstore
when "someone threw some bottles out of a building and cracked his
head open."  T.T. 388.  She explained further that the individuals
who had thrown the bottles were never caught, and that her son had
been hurt "real bad" and still suffered lingering effects from his
head injuries.   T.T. 389.  When asked by the trial court judge if
this experience may make her "more concerned" with the victim in
this case rather than the defendant, D.H. responded, "I don't think
so because I believe my son should have been aware of where he was
and where he was going aware of his surroundings."  T.T. 390.  D.H.
also indicated that her son should have known to take a different
route home that day since the individuals who threw the bottles had
said something to her son on his way to the drug store.   T.T. 390.
The prosecutor exercised a peremptory challenge against D.H., and
defense counsel lodged a Batson challenge.   T.T. 432-433.   In
response, the trial court asked defense counsel if he was "saying
[D.H.] is the only black African American juror of this panel . .

. and she has been excused solely on the basis of her race." T.T. 433. Counsel set forth his reasons for the challenge, and the trial court determined that a prima facie case had been established. T.T. 435. The trial court then asked the prosecutor for his race-neutral reasons for striking D.H. T.T. 435. The prosecutor explained that he had two reasons for doing so. First, he explained that "when [the trial court judge] mentioned 57 Wakefield, [D.H.] began to vigorously nod." T.T. 435. Second, he explained that he did "not at all care for her remarks concerning her son," and the fact that she blamed him for what happened with respect to the bottle-throwing incident. T.T. 435. The prosecutor stated that, "Wakefield is perhaps a dangerous street," and he was worried that D.H. may say Wakefield was a dangerous street and that the victim should have known better than to be there. T.T. 436. Finally, the prosecutor noted that he could not understand a mother feeling that way about her son who was "after all, not a stranger." T.T. 436. After listening to the prosecutor's explanation, the trial court denied the <u>Batson</u> challenge. The trial court judge stated, "[the prosecutor] has given a reason and I'm taking the second reason that's related to the facts of the case, that being that the son should have been aware of his surroundings and [D.H.] may feel that the victim in this case, Mr. Williams, should have been aware of his surroundings and taken some precautions or done something to avoid it to some extent. It may have been his fault what happened to him." T.T. 437. After giving both parties the opportunity to respond -- which they both took advantage of -- the

trial court judge stated that his initial "ruling stands." T.T. 443.

Step one of the <u>Batson</u> analysis is not at issue here, since the Supreme Court has held that the prima facie case of discriminatory intent becomes irrelevant to the analysis of a peremptory challenge once the trial court proceeds to the second and third steps, as it did here.  See <u>Hernandez</u>, 500 U.S. at 359.

The second step of the <u>Batson</u> inquiry is whether the prosecution offered race neutral explanations for the peremptory strikes.  This is the only burden the prosecution bears during the <u>Batson</u> analysis.  In petitioner's case, the prosecution supplied two reasons for challenging D.H.: one, her "vigorous" head-nodding when the trial court judge mentioned Wakefield Street; and, second, that D.H. blamed her son for the bottle-throwing incident that was perpetrated against him.  T.T. 436.  The Supreme Court has found that the prosecution must offer more of an explanation than a simple denial that the challenges were based on discrimination. <u>Batson</u>, 476 U.S. at 97-98.  Although it is possible that a rational reason could still be a pretext for discrimination, that determination is considered in the third step of the inquiry. <u>Hernandez</u>, 500 U.S. at 363.  The prosecution in this case met that burden by articulating distinct race-neutral reasons for striking D.H.  Therefore, the second step of the inquiry was satisfied, and the trial judge went on to the third step.

With regard to the third step of the <u>Batson</u> inquiry, a trial court's finding as to whether the prosecutor intentionally

discriminated on the basis of race when exercising a peremptory strike is a factual finding entitled to appropriate deference by a reviewing court.  <u>Batson</u>, 476 U.S. at 98 n.21 (citation omitted); <u>accord, e.g.</u>, <u>Jordan v. Lefevre</u>, 293 F.3d 587, 593 (2d Cir. 2002). Since the trial judge's conclusions during the type of inquiry contemplated by <u>Batson</u> "largely will turn on evaluation of credibility," the Supreme Court has instructed that reviewing courts "ordinarily should give those findings great deference." <u>Id.</u> (citing <u>Anderson v. Bessemer City</u>, 470 U.S. 564, 575-76 (1985)).  Here, the trial court judge considered the credibility of the reasons offered by the prosecution and gave an explanation for his decision.  After listening to both parties' responses to the ruling, the trial court judge determined that his initial ruling stood.  T.T. 443.  It is clear from the record before this Court that the trial court carefully considered the issue, and determined that there was no valid <u>Batson</u> claim.  Petitioner has provided no basis whatsoever for this Court to reject the trial court judge's findings.  The trial court's <u>Batson</u> ruling is supported by the record, and Petitioner's <u>Batson</u> claim with regard to prospective juror D.H. fails.

Accordingly, the Court cannot find that the state court's adjudication of this claim contravened or unreasonably applied settled Supreme Court law.  The claim is dismissed.

## V.    Conclusion

For the reasons stated above, the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Dkt. No. 1) is denied, and the petition is dismissed.  Because Petitioner has failed to make "a substantial showing of a denial of a constitutional right," 28 U.S.C. § 2253(c)(2), the Court declines to issue a certificate of appealability.  See, e.g., Lucidore v. New York State Div. of Parole, 209 F.3d 107, 111-113 (2d Cir. 2000).  The Court also hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this judgment would not be taken in good faith and therefore denies leave to appeal as a poor person.  Coppedge v. United States, 369 U.S. 438 (1962).

Petitioner must file any notice of appeal with the Clerk's Office, United States District Court, Western District of New York, within thirty (30) days of the date of judgment in this action.  Requests to proceed on appeal as a poor person must be filed with United States Court of Appeals for the Second Circuit in accordance with the requirements of Rule 24 of the Federal Rules of Appellate Procedure.

**IT IS SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    August 16, 2011
          Rochester, New York

-35-